No. 13-1382

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

In re HUGO GERARDO CAMACHO NARANJO;
JAVIER PIAGUAJE PAYAGUAJE,

*Appellants*,

CHEVRON CORPORATION,

*Petitioner-Appellee*,

v.

AARON MARR PAGE; DARIA FISHER PAGE,

*Respondents-Appellants*.

On Appeal From The United States District Court
For The District Of Maryland

## BRIEF OF APPELLEE CHEVRON CORPORATION

Peter E. Seley
Thomas H. Dupree, Jr.
Claudia M. Barrett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Attorneys for Appellee Chevron Corporation*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-1382   Caption: In re Hugo Gerardo Camacho Naranjo; Javier Piaguaje Payaguaje; Chevron Corp. v. Aaron Marr Page, Daria Fisher Page

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Chevron Corporation
(name of party/amicus)

who is appellee, makes the following disclosure:
        (appellant/appellee/amicus)

1. Is party/amicus a publicly held corporation or other publicly       ☑ YES ☐ NO
   held entity?

2. Does party/amicus have any parent corporations?       ☐ YES ☑ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a       ☐ YES ☑ NO
   publicly held corporation or other publicly held entity?
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly     ☐ YES  ☑ NO
   held entity that has a direct financial interest in the outcome
   of the litigation (Local Rule 26.1(b))?
   If yes, identify entity and nature of interest:


5. Is party a trade association? (amici curiae do not complete this     ☐ YES  ☑ NO
   question)
   If yes, identify any publicly held member whose stock or equity value could be
   affected substantially by the outcome of the proceeding or whose claims the
   trade association is pursuing in a representative capacity, or state that there is no
   such member:


6. Does this case arise out of a bankruptcy proceeding?               ☐ YES  ☑ NO
   If yes, identify any trustee and the members of any creditors' committee:

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION........................................................... 4

STATEMENT OF THE ISSUES................................................................ 5

STATEMENT OF THE CASE.................................................................... 5

STATEMENT OF FACTS .......................................................................... 6

    I.     The Fraudulent Lago Agrio Litigation and Judgment ......................... 7

          A.    Initial Revelations of Fraud ....................................... 7

          B.    Judgment Fraud................................................................. 11

    II.    The Southern District of New York Proceedings .............................. 13

    III.   The Pages' Role in the Fraud ........................................................... 15

    IV.   The Page Subpoenas........................................................................ 17

SUMMARY OF ARGUMENT ................................................................. 19

STANDARD OF REVIEW ....................................................................... 22

ARGUMENT .............................................................................................. 22

    I.     THE SUBPOENAS WERE ISSUED IN CONNECTION WITH NO. 11-CV-0691, A LIVE DISPUTE THAT HAS NOT BEEN DISMISSED. .................................................................................... 22

    II.    THE MAGISTRATE JUDGE DID NOT ABUSE HIS DISCRETION IN FINDING THAT PRIVILEGE HAD BEEN WAIVED ON MULTIPLE GROUNDS.......................................... 25

          A.    The Donziger Waiver Plainly Encompasses The Pages, Who Worked Under Donziger's Direction On The Ecuadorian Litigation.................................................... 26

i

**TABLE OF CONTENTS**
(continued)

**Page**

    B.    The Crime-Fraud Exception Provides An Additional And Independent Basis For Waiver. ................................................. 33

    C.    The Magistrate Judge Correctly Found Waiver As To All Documents Disclosed To Third Parties. .................................. 43

CONCLUSION ....................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chaudhry v. Gallerizzo*,
  174 F.3d 394 (4th Cir. 1999) ...............................................................33

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011) ...................................................................6

*Chevron Corp. v. Donziger*,
  768 F. Supp. 2d 581 (S.D.N.Y. 2011) ....................................... passim

*Chevron Corp. v. Donziger*,
  783 F. Supp. 2d 713 (S.D.N.Y. 2011) ....................................................7

*Chevron Corp. v. Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012) ..................................................15

*Chevron Corp. v. Donziger*,
  886 F. Supp. 2d 235 (S.D.N.Y. 2012) ................................. 3, 8, 35, 36

*Chevron Corp. v. Donziger*,
  No. 11-cv-0691 (LAK), 2013 U.S. Dist. LEXIS 55877
  (S.D.N.Y. Apr. 12, 2013) ....................................... 20, 29, 30, 32

*Chevron Corp. v. Donziger*,
  No. 11-cv-0691, 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013) .................. 38, 40

*Chevron Corp. v. E-Tech International*,
  No. 10-cv-1146-IEG (WMC), 2010 WL 3584520
  (S.D. Cal. Sept. 10, 2010) ....................................................... 4, 10

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ....................................................... 6, 14, 15

*Chevron Corp. v. Stratus Consulting, Inc.*,
  No. 10-cv-00047, 2010 WL 3923092 (D. Colo. Oct. 1, 2010) .........................45

*Chevron Corp. v. Weinberg Group*,
  682 F.3d 96 (D.C. Cir. 2012) ...............................................................38

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Fonar Corp. v. Johnson & Johnson*,
227 U.S.P.Q. 886 (D. Mass. 1985) .......................................................29

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011) ...............................................................10

*In re Chevron Corp.*,
709 F. Supp. 2d 283 (S.D.N.Y. 2010) ...................................................6

*In re Chevron Corp.*,
749 F. Supp. 2d 135 (S.D.N.Y. 2010) ..................................................26

*In re Chevron Corp.*,
749 F. Supp. 2d 141 (S.D.N.Y. 2010) ...................................... 6, 11, 13

*In re Chevron Corp.*,
749 F. Supp. 2d 170 (S.D.N.Y. 2010) .......................................... 17, 27

*In re Chevron Corp.*,
No. 11-24599-CV, 2012 WL 3636925 (S.D. Fla. June 12, 2012) ................ 4, 40

*In re Chevron Corp.*,
No. H-10-134, 2010 WL 2038826 (S.D. Tex. May 20, 2010) ..................... 44, 45

*In re Doe*,
662 F.2d 1073 (4th Cir. 1981) .............................................................33

*In re Grand Jury Investigation*,
352 F. App'x 805 (4th Cir. 2009) ........................................................40

*In re Grand Jury Proceedings #5*,
401 F.3d 247 (4th Cir. 2005) ..............................................................43

*In re Grand Jury Proceedings*,
33 F.3d 342 (4th Cir. 1994) ..................................................... 22, 33, 42

*In re Grand Jury Subpoena: Under Seal*,
415 F.3d 333 (4th Cir. 2005) ..............................................................22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*International Union of Operating Engineers v. Philip Morris*,
No. 3:97-0708, 1999 US Dist. LEXIS 21097 (S.D. W.Va. June 28, 1999)........30

*Karpel v. Inova Health Sys. Servs.*,
134 F.3d 1222 (4th Cir. 1998)...............................................................................23

*Lago Agrio Plaintiffs v. Chevron Corp.*,
409 F. App'x 393 (2d Cir. 2010)................................................... 27, 28

*Leonen v. Johns-Manville*,
135 F.R.D. 94 (D. N.J. 1990) ...............................................................................30

*Shahinian v. Tankian*,
242 F.R.D. 255 (S.D.N.Y. 2007)..........................................................................42

*Sheet Metal Workers International Ass'n v. Sweeney*,
29 F.3d 120 (4th Cir. 1994)....................................................... 22, 33, 43

*Transamerica Computer Co. v. IBM Corp.*,
573 F.2d 646 (9th Cir. 1978)................................................................................31

*United States v. Cohn*,
303 F. Supp. 2d 672 (D. Md. 2003) ....................................................................41

*United States v. Kaplan*,
No. 02 CR. 883, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) .........................43

**Statutes**

28 U.S.C. § 1291 ...................................................................................................4

28 U.S.C. § 1331 ...................................................................................................4

## INTRODUCTION

This appeal arises from the refusal of Aaron and Daria Page to produce documents in response to valid subpoenas. The Pages worked initially as interns, and later as lawyers, under the direct supervision and control of attorney Steven Donziger — a key player in the scheme to procure a fraudulent $19 billion judgment against Chevron by a court in Lago Agrio, Ecuador. As many federal courts throughout the country have recognized, Chevron has uncovered evidence that Donziger, working with other attorneys and consultants, engaged in intimidation of judges, bribery, fabrication of evidence, and the secret and unlawful ghostwriting of judicial documents in pursuit of the corrupt, multibillion-dollar judgment against Chevron. The scope of the fraud and the evidence of the Ecuadorian Plaintiffs' lawyers engaging in "inappropriate, unethical and perhaps illegal conduct" has sent "shockwaves through the nation's legal communities." *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. at 3-4 (D.N.M. Sept. 2, 2010) (reproduced at JA 32 – JA 33).

After Chevron uncovered the fraud, it sued Donziger and others in the Southern District of New York, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, among other claims. In connection with that lawsuit, Chevron served the Pages with subpoenas from the District of Maryland, where they reside. The subpoenas sought documents related to the Pages' work for

Donziger in procuring the fraudulent Ecuadorian judgment. When the Pages asserted that many of the documents were privileged and refused to comply with the subpoenas, Chevron moved to compel. After a lengthy evidentiary hearing, the magistrate judge ordered the Pages to produce the documents at issue, holding that any applicable privilege had been waived on multiple grounds. JA 1584 – 1592. The district court rejected the Pages' Rule 72 objections and upheld the magistrate judge's order in full. JA 4 – 5.

The Pages' arguments on appeal are waived, meritless, or both. The district court's judgment was correct and should be affirmed.

The Pages open their brief with an argument they never presented below. They assert that Chevron's subpoenas were issued in connection with a lawsuit that has now been dismissed. Even if this Court were to consider an argument that was waived, it is meritless. As is plain from the face of the subpoenas, they were issued in connection with No. 11-cv-0691 — the New York RICO lawsuit styled *Chevron Corp. v. Donziger*. *See* JA 111 (Aaron Page subpoena); JA 141 (Daria Page subpoena). That lawsuit has not been dismissed, and in fact is scheduled for trial in the fall.

In challenging the merits of the judgment below, the Pages face an uphill battle. The magistrate judge identified *three* separate and independent bases for his conclusion that any privilege that governed the Pages' documents has been waived.

2

First, Judge Lewis A. Kaplan, the judge presiding over the *Donziger* litigation in New York, previously held that Donziger — who directed and supervised the work of the Pages — had waived any applicable privileges or protections concerning documents related to the fraudulent scheme. JA 1584 – 1586. That waiver clearly encompasses documents possessed by the Pages, who worked as his interns and associates on the Ecuadorian litigation. Second, the magistrate judge determined that the crime-fraud exception provides an additional ground for waiver. JA 1591 – 1592. The Pages were integral to the fraudulent scheme — indeed, Mr. Page authored one of the documents that was copied into the fraudulent Ecuadorian judgment itself (JA 1367; JA 1563; JA 419 – 420) — and Chevron has made out far more than the prima facie case of fraud necessary to invoke the exception. Third, the magistrate judge held that any applicable privilege or protection was waived as to documents disclosed to third parties. JA 1586 – 1588.

The Pages' claim that this is a "manufactured scandal," Page Br. 4, is false. Numerous other federal courts, like the magistrate judge and district court below, have found the Ecuadorian litigation rife with fraud.[1] And many have similarly

---

[1] *See, e.g.*, *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 292 (S.D.N.Y. 2012); *In re Chevron Corp.*, No. 11-24599-CV, slip op. at 4, 26 (S.D. Fla. June 12, 2012); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011); *Chevron Corp. v. E-Tech Int'l*, No. 10-cv-1146-IEG (WMC), 2010 WL

[Footnote continued on next page]

3

invoked the crime-fraud exception in overriding claims of privilege.[2]  This Court

should reach the same conclusion already reached by so many other federal courts

and affirm the judgment below.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, as

this case involves the enforcement of federal court subpoenas and arises under the

laws of the United States.  The district court entered final judgment on

February 28, 2013 (JA 4 – 5) and the Pages timely noticed an appeal on March 20,

2013.  JA 1.[3]  This Court has jurisdiction under 28 U.S.C. § 1291.

---

[Footnote continued from previous page]

3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. at 3-4 (D.N.M. Sept. 2, 2010); *Chevron Corp. v. Camp*, Nos. 10-mc-27, 10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, No. 10-cv-2675 (SRC), Dkt. 33 (D.N.J. June 11, 2010).

[2]  *See, e.g.*, *In re Chevron Corp.*, No. 10-2675, Dkt. 33 at 43 (D.N.J.) ("[T]he Court is satisfied that an adequate prima facie demonstration of the operation of the crime-fraud exception indeed has been established here.") (reproduced at JA 16); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. at 11 (D.N.M. Sept. 13, 2010) ("The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants.") (reproduced at JA 27).

[3]  Two of the Ecuadorian Plaintiffs — Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje — appeared as "Interested Parties" below and joined the Pages in noticing an appeal.

## STATEMENT OF THE ISSUES

I.      Whether the district court had the power to enforce the subpoenas issued in connection with Southern District of New York Case No. 11-cv-0691.

II.     Whether the magistrate judge abused his discretion in finding that any applicable privilege concerning the Pages' documents had been waived on multiple grounds.

## STATEMENT OF THE CASE

On May 20, 2011, Chevron issued subpoenas to the Pages from the United States District Court for the District of Maryland seeking documents and testimony in connection with the New York litigation styled *Chevron Corp. v. Donziger*, S.D.N.Y. No. 11-CV-0691.  JA 111 – 140; JA 141 – 170.  The Pages refused to respond adequately to Chevron's subpoenas.  They produced fewer than 250 pages of documents and asserted meritless claims of attorney-client privilege and work product protection.  Chevron petitioned the Maryland district court for an order compelling production on July 15, 2011.  JA 6 – 10.

Magistrate Judge Day overruled the Pages' privilege objections on August 31, 2011, and ordered the Pages to produce all documents responsive to Chevron's subpoenas.  JA 1584 – 1594.  On September 2, 2011, the Pages produced all the documents over which they had previously claimed privilege, and subsequently filed Rule 72 objections with the district court.  JA 1398 – 1428.

After discovery in the New York case was stayed, the district court entered its own discovery stay on September 26, 2011. JA 1517 – 1518. Then, once the New York discovery stay was lifted, the district court in this case followed suit, and lifted its own discovery stay on January 24, 2013. JA 1948 – 49. The court directed Chevron to respond to the Pages' Rule 72 objections, which Chevron did on February 7, 2013. *Id*. The Pages did not file a reply. On February 28, 2013, District Judge Titus affirmed Magistrate Judge Day's order in its entirety. JA 4 – 5.

## STATEMENT OF FACTS

The history of the Ecuadorian litigation which forms the basis for this and related proceedings is long. Accordingly, Chevron sets forth herein only those facts relevant to this appeal. For an overview of the litigation and the fraud that has been perpetrated by the Ecuadorian Plaintiffs, *see Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *see also In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010); *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010), *aff'd sub nom.*, *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

## I.    The Fraudulent Lago Agrio Litigation and Judgment

On February 14, 2011, a court in Lago Agrio, Ecuador issued a $19 billion judgment against Chevron in an action relating to oil exploration activities by a consortium operating from 1967 until 1990.  JA 514 – 701.  The consortium ultimately was comprised of Ecuador's national oil producer, Petroecuador, and Texaco Petroleum Company ("TexPet"), a fourth tier subsidiary of Texaco.[4]  After TexPet's concession contract with Ecuador ended, TexPet conducted remediation and the Government of Ecuador released TexPet from all liability for environmental harms.  *In re Chevron Corp.*, 709 F. Supp. 2d at 286-87.  Despite TexPet's remediation and Ecuador's release, the Ecuadorian Plaintiffs filed suit in 2003, naming Chevron as the sole defendant in that action.  *See Chevron Corp. v. Donziger*, 783 F. Supp. 2d 713, 716 (S.D.N.Y. 2011).  It is in the context of these dubious beginnings that the Lago Agrio case proceeded.

### A.    Initial Revelations of Fraud

During the Lago Agrio litigation, the Ecuadorian Plaintiffs pressured the Ecuadorian court to stop the evidence-gathering process known as "judicial inspections" by threatening to file an ethics complaint against the judge.  *Chevron*

---

[4]  In 2001, Chevron acquired the stock of Texaco via a reverse-triangular merger.

*Corp. v. Donziger*, 886 F. Supp. 2d at 288-89; *see also Donziger*, 768 F. Supp.
at 606-07; *id.* at 611; JA 843.  Then, at the Ecuadorian Plaintiffs' request, the
Ecuadorian court appointed a purportedly independent court expert named Richard
Stalin Cabrera Vega to conduct an official "global assessment" of the harms
allegedly caused by TexPet in the Oriente region.  *In re Chevron Corp.*, 749 F.
Supp. 2d at 144.

Through discovery proceedings under 28 U.S.C. § 1782, Chevron later
discovered that Cabrera was not in fact independent, as he had often represented in
Ecuadorian court filings, but that he was secretly paid by the Ecuadorian Plaintiffs
and operated at their direction, going so far as permitting them to ghostwrite his
official report and then fraudulently presenting it as his independent work while
denying any relationship with the Ecuadorian Plaintiffs.  JA 144 – 145.  The
Ecuadorian Plaintiffs' lawyers themselves recognized the seriousness of this
discovery by Chevron, writing in an internal email to Donziger that "the effects are
potentially devastating in Ecuador (apart from destroying the proceeding, all of us,
your attorneys, might go to jail)."  JA 347 – 349.  Recently, two of the authors of
the ghostwritten Cabrera Report, Douglas Beltman and Ann Maest, declared under
oath that they ghostwrote the Cabrera Report, that it was based on assumptions
provided by Donziger with no scientific basis, and that they disavowed it in its
entirety.  *See Chevron Corp. v. Donziger*, No. 11-cv-0691, Dkt. 1007-1 at

Ex. 3652, ¶¶ 15, 57, 73, 76 (S.D.N.Y. Apr. 12, 2013); *id.* at Ex. 3653, ¶¶ 8-9, 13-15, 27, 38, 50.

Additional evidence of fraud obtained by Chevron includes outtakes[5] from a film called *Crude*, instigated and funded by the Ecuadorian Plaintiffs themselves, which actually capture the fraud on film, and include scenes that show:

- The Ecuadorian Plaintiffs secretly meeting with Cabrera, prior to his appointment by the Ecuadorian court, to plan the purportedly independent report (JA 61 – 63; JA 70 – 78; JA 52);

- Donziger describing how he was going to influence the judge to rule in his favor through "pressure, intimidation and humiliation" (*Donziger*, 768 F. Supp. 2d at 612 (internal quotation marks omitted));

- Donziger stating that the Ecuadorian Plaintiffs need to "mobiliz[e] the country politically so that no judge can rule against us and feel like he can get away with it in terms of his career" (JA 1203; JA 1196);

- Donziger and other members of the Ecuadorian Plaintiffs' team discussing how the Ecuadorian judge thinks he might be killed if he rules against the Ecuadorian Plaintiffs, to which Donziger responds, "He may not be, but . . . he thinks he will be . . . Which is just as good" (JA 1201; JA 1196); and

- Donziger and the Ecuadorian Plaintiffs' consultants explicitly acknowledging that the scientific evidence purporting to support their claims is, in their words, "just a bunch of smoke and mirrors and bullshit" (JA 69; JA 101 – 110; JA 53).

---

[5] For the Court's convenience, Chevron has included in the Joint Appendix the actual video clips of the outtakes. The clips were filed in a separate Exhibit Volume and are designated JA 61 – 69, and JA 1201 – 1204. Transcripts of some of the video clips are also included in the Joint Appendix at JA 70 – 110.

*See also Donziger*, 768 F. Supp. 2d at 604-611 (recounting evidence of fraud as reflected in *Crude* outtakes). The *Crude* outtakes also show the Pages assisting Donziger with these activities (JA 65); referring to the Ecuadorian Plaintiffs' "radical" scientific experts and the corruption of the judiciary (JA 65 – 66; JA 87; JA 53); and being present at the filing of the Cabrera report, with Cabrera, despite the fact that no one was supposed to be told ahead of time exactly when the Cabrera report would be filed (JA 68; *see also* JA 53).

Courts presiding over these Section 1782 proceedings have been appalled by the nature and extent of the fraud, finding that "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own." *Chevron Corp. v. E-Tech Int'l*, No. 10-cv-1146, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010). As one federal court stated, in rejecting the Ecuadorian Plaintiffs' argument that Ecuadorian proceedings were governed by different norms, "the concept of fraud is universal, and [ ] what has blatantly occurred in this matter would in fact be considered fraud by any court." *Camp*, 2010 WL 3418394, at *6.

Many other federal courts have reached the same conclusion, invoking the crime-fraud exception to overrule claims of privilege. *See, e.g.*, *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011) ("[W]e believe that this showing . . . is

sufficient to make a prima facie showing of a fraud that satisfies the first element of the showing necessary to apply the crime-fraud exception to the attorney-client privilege."); *In re Chevron Corp.*, No. 10-cv-2675, Dkt. 33 at 44:11-16 (D. N.J.) ("[T]he provision of materials and information by consultants on the litigation team of the Lago Agrio plaintiffs in what appears to be a secret and an undisclosed aid of a supposedly neutral court-appointed expert in this Court's view constitutes a prima facie demonstration of a fraud on the tribunal."); *In re Chevron Corp.*, 749 F. Supp. 2d at 167 ("[T]here is more than a little evidence that [plaintiffs' counsel's] activities . . . come within the crime-fraud exception to both the privilege and to work product protection."); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. at 11 (D. N.M. Sept. 13, 2010) ("The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants.") (reproduced at JA 27).

**B.    Judgment Fraud**

In addition to the Cabrera fraud, forensic analysis has now demonstrated that the Ecuadorian Plaintiffs' attorneys also ghostwrote the Ecuadorian judgment itself.  The judgment contains substantial verbatim passages from the Ecuadorian Plaintiffs' lawyers' internal documents, including memoranda and data from

internal spreadsheets and databases, none of which appear anywhere in the record.
JA 407 – 435 (Expert Report of Robert Leonard); JA 436 – 455 (Expert Report of
Michael Younger); JA 456 (email showing Aaron Page's involvement in drafting
the Alegato, portions of which appear in the Judgment); JA 471 – 472 (same).

One of the documents surreptitiously copied in the judgment is a document
referred to as the "Fusion Memo," which was authored by Mr. Page and which
incorrectly purported to find Chevron liable for TexPet's alleged conduct despite
the fact that Chevron did not succeed to Texaco's liabilities.  JA 981.  The
Ecuadorian Plaintiffs incorporated this flawed analysis verbatim into the judgment.
*E.g.*, JA 419 – 420.  Mr. Page later praised the judgment for "engaging and
resolving complex legal issues on . . . corporate law (e.g., whether Chevron
inherited Texaco's liabilities upon merger)."  JA 390.

On January 3, 2012, an Ecuadorian appellate court affirmed the judgment,
expressly refusing to consider the evidence of fraud submitted by Chevron, and
instead explaining that those allegations and the relevant evidence were before the
Southern District of New York in Chevron's RICO suit.  JA 1960 ("this Chamber
has no competence to rule on the conduct of counsel, experts or other officials or
administrators and auxiliaries of justice").  Immediately after the appellate decision
issued, the Ecuadorian Plaintiffs filed a motion for "amplification and
clarification," asking the court to say that it had reviewed and rejected Chevron's

12

allegations of fraud.  JA 1984.  Mere hours after briefing on the motion to clarify was completed, the appellate court declared that, contrary to its prior opinion, it had reviewed *some* of the fraud record and found "no reliable evidence" of "any crime" by the Ecuadorian Plaintiffs or their agents.  JA 1986.  Even then, however, the Ecuadorian appellate court reiterated that "it stays out of these accusations, preserving the parties' rights . . . to continue the course of the actions that have been filed in the United States of America."  JA 1987.

## II.    The Southern District of New York Proceedings

On February 1, 2011, Chevron filed a complaint in the Southern District of New York alleging claims under RICO and state law and seeking a declaratory judgment and preliminary injunction enjoining enforcement of the Ecuadorian judgment.  JA 802 – 959.  The case was assigned to Judge Kaplan, who had issued rulings compelling production of the *Crude* outtakes and granting Chevron discovery from Donziger — both of which were affirmed by the Second Circuit.  *See In re Chevron Corp.*, 749 F. Supp. 2d 141; *In re Chevron Corp.*, 709 F. Supp. 2d 283.

On March 7, 2011, Judge Kaplan issued a preliminary injunction restraining enforcement of the judgment.  *See Donziger*, 768 F. Supp. 2d at 660.  The court's 131-page ruling included detailed factual findings, frequently quoting the Ecuadorian Plaintiffs' own incriminating documents and the *Crude* outtakes.  *See*

*generally* 768 F. Supp. 2d 581. The court concluded that Chevron was likely to prevail on its claim that Ecuador "does not provide impartial tribunals or procedures compatible with the requirements of due process of law," and that Chevron had "raised substantial questions that present a fair ground for litigation as to whether the Ecuadorian judgment is a result of fraud practiced on the Ecuadorian tribunal." *Id.* at 636-37 (quotation marks omitted). The declaratory judgment count, pursuant to which the preliminary injunction had been entered, was subsequently bifurcated (*Chevron Corp. v. Donziger*, 11-cv-0691, Dkt. 278 (S.D.N.Y. Apr. 15, 2011)), and later severed at Donziger's request (*Chevron Corp. v. Donziger*, 11-cv-0691, Dkt. 328 (S.D.N.Y. May 31, 2011)). The declaratory judgment count then proceeded as the separate action of *Chevron Corp. v. Salazar*, No. 11-cv-3718.

On January 26, 2012, the Second Circuit remanded *Salazar* with instructions to dismiss the declaratory-judgment claim, while recognizing that Chevron would proceed with its RICO claim (and other state-law claims). *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012). The ruling was based purely on a procedural question — the availability of relief under the New York Uniform Foreign Country Money-Judgments Recognition Act. Nothing in the Second Circuit's opinion suggested that Judge Kaplan erred in his factual findings and the court did not rule on the merits of Chevron's RICO, fraud, and other claims. *See*

14

*id.* at 247 n.17; *see also Donziger*, 871 F. Supp. 2d 229, 238 (S.D.N.Y. 2012)

("The [Second Circuit's] opinion did not pass, one way or the other, on this

Court's findings with respect to the nature of the Ecuadorian tribunals or the

evidence of fraud in the procurement of the Judgment.").

## III.    The Pages' Role in the Fraud

The Pages, who are husband and wife, have played an integral role in the

Lago Agrio fraud.  They first began working for Steven Donziger the year they

graduated from law school, and continued working for him after they became

practicing lawyers.  JA 45 – 47.  From the beginning, they worked on the Lago

Agrio litigation under Donziger's direct supervision and control.  *Id.*; *see also*

JA 1584 (unchallenged factual finding of magistrate judge that "all of the work that

was performed here [by the Pages] was performed under Mr. Donziger").

The Pages helped develop what they described as "a number of

'supplemental' litigation strategies."  JA 383.  These included efforts to instigate

an SEC investigation of Chevron, to charge Chevron with genocide to incite public

outrage, and to concoct arguments as to why Texaco's remediation was supposedly

fraudulent.  *Id.*  Mr. Page was also instrumental in devising baseless claims that

Chevron had violated the Foreign Corrupt Practices Act in an effort to pressure

Chevron to settle the fraudulent Ecuador case.  He wrote a memorandum on the

subject and argued that the Ecuadorian Plaintiffs should send it to the United States

15

Government to advance their pressure campaign against Chevron, even though he admitted that they "lack[ed] clear evidence" that Chevron had violated the law. JA 1885.

The Pages devised a $20 billion damages estimate for the Lago Agrio case, despite the fact they have no scientific background or training of any kind. *See* JA 384 ("The environmental evidence and arguments in the case are highly complex (and not the sort of thing they teach in law school)"). Aaron Page pushed the baseless estimate to Donziger: "I really don't understand why you're shying away from going up on the remediation estimate. Like I wrote earlier, while 20b can be attacked it can't be destroyed in a way that will embarrass us. This shit is really unprecedented, nobody has every [sic] 'pump-and-treat'-ed an ecosystem before. And I really think upping it will make media/court/CVX itself start thinking in terms of billions, albeit lower . . . ." JA 1929.

The Pages also contributed to the fraud surrounding the judgment itself. Mr. Page drafted the Fusion Memo, portions of which appear verbatim in the judgment despite having never been submitted to the Ecuadorian court. *See* JA 1563 at 16-18; *see also* JA 1591. Mr. Page also helped write the "Draft Alegato," a legal brief that was not filed with the Ecuadorian court, which also contains language that was copied directly into the judgment. *See* JA 424 – 426.

16

## IV.    The Page Subpoenas

In ordering the Pages to comply with Chevron's subpoenas, the magistrate judge identified three independent bases for his ruling that any applicable privilege had been waived.  *See* JA 1584 – 1592.  First, the court explained that Judge Kaplan, in the New York RICO proceeding, had already held that Donziger had waived any privilege attaching to documents in his possession, custody and control.  JA 1584 (citing *In re Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y. 2010)).  Because the Pages worked on the Lago Agrio litigation under Donziger's direct control and supervision, the Donziger waiver plainly encompassed documents held by the Pages.  Indeed, those documents should already have been produced by Donziger.  Second, the court held that the crime-fraud exception applied to vitiate any privilege, noting that Chevron had made out a prima facie case of fraud based on (among many other things) evidence that the Fusion Memo drafted by Mr. Page had reappeared verbatim in the judgment of the Ecuadorian court.  JA 1591 – 1592.  Third, the court held that any applicable privilege was waived as to documents that were disclosed to third parties, such as the purportedly "independent" expert Cabrera.  JA 1586 – 1589.

In addition to the proceeding that is the subject of the instant appeal, there is a related proceeding arising from a subpoena Chevron served under 28 U.S.C. § 1782, seeking Mr. Page's documents for use in international tribunals, including

the Ecuador courts and an international Treaty Arbitration pending in The Hague. *See In re Chevron Corp.*, No. 8:11-cv-0395 (D. Md.). That action was referred to Magistrate Judge Day for disposition. After a hearing on January 25, 2013, the court again found that the Donziger waiver encompassed documents held by Mr. Page, that the crime-fraud exception applied, and that disclosure of documents to third parties further waived the privilege. JA 2086 – 2094.

In reaching these conclusions, the court emphasized that "Chevron has shown to anyone with common sense that this [Ecuadorian judgment] is a blatant cut and paste exercise" from documents "internal to [the Ecuadorian Plaintiffs'] counsel" that were "incorporated into [the] judgment. . . . The parroting of that information . . . leaves me with no doubt that something is going on, something is amiss there." JA 2093. The court pointedly noted Mr. Page's failure to offer any coherent explanation for how his work product somehow reappeared verbatim in the Ecuadorian judgment despite not having been filed in the court record: "[T]he failure or should I say more accurately the inability for the Ecuadorian Plaintiffs or Mr. Page to identify a single explanation in that record at this time, after the passage of this much time, doesn't help." *Id.* The court elaborated:

> [I]n my opinion, even the information provided is lacking in persuasion. We are still left more than a year-plus later using speculative terms, suggesting that the information at issue could have derived from other sources. Yet Chevron points to six documents

18

internal to [the Ecuadorian Plaintiffs'] counsel, two of which were drafted by Mr. Page, as being incorporated into that judgment.  As I stated in the related case, there is ample evidence of the existence of a fraudulent scheme in that these documents bear close relationship to it. . . . And the actual knowledge of Mr. Page as an individual in this exercise is not required, but it looks pretty close to it.  And I do find that there is substantial extrinsic evidence of wrongdoing.

JA 2093 – 2094.

In their brief, the Pages make no mention of these findings by the court, nor do they acknowledge that the court rejected as "speculative" (JA 2093) their contention that their work product could have appeared in the Ecuadorian judgment by "non-nefarious means" (Page Br. 21).

## SUMMARY OF ARGUMENT

**I.**     The Pages advance a convoluted theory that the subpoenas were issued in connection with a lawsuit that was dismissed.  But they failed to present this argument to the district court, thereby waiving it.  Moreover, it is demonstrably wrong.  The subpoenas, on their face, state that they are issued in connection with the New York RICO lawsuit (No. 11-cv-0691) — a lawsuit that remains live and is scheduled for trial this fall.  *See* JA 111, 141.  Although the Pages contend that the subpoenas were issued in connection with the *Salazar* action, they gloss over the fact that the subpoenas were issued <u>before</u> the *Salazar*

19

case was created through the severance of one of the counts of the RICO lawsuit, and it is self-evident that the subpoenas could not have been issued in connection with a case that did not exist at the time. Even the Pages concede that they are asking this Court to rewrite the language of the subpoenas by replacing the case number that appears on them with a different case number. *See* Page Br. 15 (admitting that "the Page Subpoenas do bear the docket number '11-cv-0691'").

II.    The magistrate judge found privilege waiver on multiple independent grounds. That ruling was correct and should be affirmed.

A.    The Donziger waiver plainly encompasses the documents in the Pages' possession. The Pages do not dispute the magistrate judge's factual finding that at all relevant times they worked for Donziger and under his supervision. *See* JA 1584. If a partner in a law firm waives privilege, that waiver obviously applies to documents possessed by the associates and interns working on the case under his or her direction. The Pages' contention that Donziger's waiver was "involuntary" is contradicted by Judge Kaplan's express finding that the waiver was the direct and foreseeable result of Donziger's "voluntary and deliberate choice" not to timely produce a privilege log in an attempt to seize an "improper" tactical advantage in the litigation. *See Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2013 U.S. Dist. LEXIS 55877, at *14-15 (S.D.N.Y. Apr. 12, 2013). The Pages rely on cases suggesting that when a party inadvertently produces documents

20

due to an expedited discovery schedule, or when racing to comply with a court order, that does not waive the privilege, but this case is very different: it concerns a waiver arising from a conscious and deliberate bad-faith litigation strategy.

      B.    The crime-fraud exception provides an additional basis for waiver. Chevron established far more than the prima facie case of fraud necessary to invoke the exception. As the magistrate judge found, the Fusion Memo drafted by Mr. Page — which was not part of the Ecuadorian court record — nonetheless reappeared "virtual[ly] line-by-line" in the opinion of the Ecuadorian court, and to this day the Pages have never offered a coherent explanation for how this could possibly have happened absent fraud. The Pages' argument that the magistrate judge should have conducted an in camera, document-by-document review is misplaced. *All* of the Pages' work for Donziger was in furtherance of the fraudulent Ecuadorian litigation and judgment, and this Court accords district courts wide discretion in determining when an in camera review is necessary. The magistrate judge's invocation of the crime-fraud exception is consistent with the rulings of the many other federal courts that have reviewed the same evidence and found substantial evidence of fraud by Donziger and the Ecuadorian Plaintiffs.

      C.    The magistrate judge correctly concluded that the Pages could not claim any privileges or protections as to documents that were disclosed to third

parties, such as the purportedly neutral "expert" Cabrera. Any such disclosure is utterly inconsistent with maintaining confidentiality.

## STANDARD OF REVIEW

Where, as here, a district court's "conclusions as to the non-existence of any attorney-client privilege . . . rest essentially on determinations of fact," this Court reviews those findings for clear error. *See Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 123 (4th Cir. 1994). A factual determination is clearly erroneous only when the Court is "left with the definite and firm conviction that a mistake has been committed." *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338 (4th Cir. 2005) (internal quotation marks omitted). Likewise, a district court's determination of the applicability of the crime-fraud exception to attorney-client privilege will not be reversed "absent a clear showing of abuse of discretion." *See In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994). To the extent the district court's privilege ruling rests on legal principles, it is reviewed *de novo*. *Sweeney*, 29 F.3d at 125.

## ARGUMENT

### I. THE SUBPOENAS WERE ISSUED IN CONNECTION WITH NO. 11-CV-0691, A LIVE DISPUTE THAT HAS NOT BEEN DISMISSED.

The Pages insist that Chevron's subpoenas were issued in connection with the *Salazar* action — No. 3718 — which has now been dismissed. That this is the

22

Pages' *lead* argument on appeal is telling. The subpoenas on their face show that they were *not* issued in connection with No. 3718. Rather, they were issued in connection with No. 0691, the *Donziger* action in the Southern District of New York that is scheduled for trial on October 15, 2013. *See* JA 111, 141. The Pages concede this point. *See* Page Br. 15 (admitting that "the Page Subpoenas do bear the docket number '11-cv-0691'"). Because *Donziger* is a live dispute, the subpoenas are perfectly valid and the district court did not err by enforcing them.

The Pages' argument fails at the threshold because it is waived. They never presented this argument to the magistrate judge or to the district court. The Pages now contend that "[w]hen the *Salazar* Action was dismissed . . . all related and ancillary proceedings — including this discovery proceeding — necessarily went with it." Page Br. 13. But after *Salazar* was dismissed, they never argued in the district court that this action should be dismissed as a result. Even when the stay of discovery in the underlying action was lifted and the district court directed Chevron to respond to the Pages' objections, the Pages never raised this argument. *See* JA 4 (noting that "no reply was filed by the Respondents"). The argument is therefore waived. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) ("We have repeatedly held that issues raised for the first time on appeal generally will not be considered.").

Even if this Court were to consider the argument, it is meritless. The Pages'
argument amounts to a shell game. They rely on the fact that the *Donziger* case
was severed, and that discovery was allowed in the *Salazar* action and stayed as to
the remainder of the case. But they make a concession that is fatal to their claim:
they admit that the subpoenas were issued *prior to* severance. *See* Page Br. 15
("the Page Subpoenas were issued prior to severance of the *Salazar* Action").
Thus, it is literally impossible that the subpoenas could have been issued in
connection with the dismissed action. Indeed, this Court need look no further than
the face of the subpoenas themselves, which show that they were issued in
No. 0691. *See* JA 111, 141.

Moreover, at the time the district court issued the order under review, the
Southern District of New York had lifted the discovery stay in the underlying
action. The discovery stay was lifted on February 16, 2012, and the district court
issued its order affirming the magistrate judge's ruling on February 28, 2013.
Accordingly, there can be no genuine dispute that the subpoena was issued in
No. 0691 at a time when the dispute was live and there was no discovery stay, *and*
that the district court ruled at a time when the dispute was live and there was no
discovery stay. The fact that Count 9 of the RICO lawsuit was dismissed in the
interim is irrelevant to the question of enforceability because the subpoena is
plainly enforceable as to all the other counts in the complaint.

24

The Pages note that in one of its briefs, Chevron included a sentence describing the underlying action as one seeking a declaratory judgment.  Page Br. 16.  But that statement obviously cannot transform subpoenas that were expressly issued in connection with No. 0691 into ones issued in connection with a different case.  Likewise, the fact that Chevron notified the district court that the *Salazar* action had been stayed is completely unremarkable.  All that meant was that discovery in the Pages' case could not proceed until the stay of discovery on the remaining counts in No. 0691 (*i.e.*, the counts other than Count 9) had been lifted.  Once the stay as to the remainder of No. 0691 was lifted on February 16, 2012, discovery in this case could — and did — proceed.  And the fact that Chevron served Mr. Page with an additional subpoena is hardly surprising given the extreme lengths he has gone to in an effort to avoid and obstruct his discovery obligations.

## II.     THE MAGISTRATE JUDGE DID NOT ABUSE HIS DISCRETION IN FINDING THAT PRIVILEGE HAD BEEN WAIVED ON MULTIPLE GROUNDS.

The magistrate judge determined that the Donziger privilege waiver encompassed the documents held by the Pages, who worked as Donziger's interns and associates on the Lago Agrio litigation.  The magistrate judge also concluded that the crime-fraud exception provided an additional and independent basis for waiver.  Finally, the magistrate judge found that any applicable privilege or

25

protection was waived as to documents disclosed to third parties. All of those determinations were correct and the judgment below may be affirmed on multiple grounds.

### A. The Donziger Waiver Plainly Encompasses The Pages, Who Worked Under Donziger's Direction On The Ecuadorian Litigation.

In connection with a proceeding under 28 U.S.C. § 1782, Chevron served Donziger with a subpoena in the Southern District of New York on August 9, 2010. Donziger moved to quash the subpoena on burden and privilege grounds, but failed to submit a privilege log. Judge Kaplan held that Donziger had therefore waived any applicable privilege pursuant to Federal Rule of Civil Procedure 26(b)(5) and Local Civil Rule 26.2 of the Southern and Eastern Districts of New York. *See In re Chevron Corp.*, 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010), *aff'd*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

The court stated, however, that it would consider relieving Donziger of the waiver "[p]rovided that Donziger files a complete privilege log on or before October 29, 2010." 749 F. Supp. 2d at 140 n.17. Donziger missed that deadline as well. On November 15, 2010, he filed a "purported privilege log — which [was] over 2,000 pages long and claim[ed] privilege as to 8,652 documents . . . [yet] list[ed] not even one document that was written by or addressed to any of the Lago

Agrio plaintiffs — the clients whose privilege supposedly is being asserted." *See* 749 F. Supp. 2d at 173.

Judge Kaplan thus adhered to his determination that Donziger had waived any applicable attorney-client privilege. *Id.* at 185. He found that Donziger's failure to submit a privilege log was neither an oversight nor an innocent mistake. To the contrary, he explained, it "was a deliberate attempt to structure the response to [Chevron's] subpoenas in a way that would create the maximum possibility for delay," with the goal of obtaining a judgment against Chevron in Ecuador before Chevron got the documents responsive to the subpoena. *Id.* at 185. Judge Kaplan emphasized that "the tactical advantage that Donziger and the Lago Agrio plaintiffs have gained and the disadvantage to which they have put their adversaries was not simply a consequence of errors made and positions taken for benign reasons." *Id.* at 184. Rather, it was a knowing and calculated attempt "to achieve that tactical advantage at their adversaries' expense" — a conclusion reinforced by the many frivolous assertions of privilege in Donziger's untimely privilege log that suggested "that Donziger and the Lago Agrio plaintiffs are not operating in entire good faith." *Id.*

The Second Circuit conducted "an independent review of the record" and affirmed Judge Kaplan in full. *See Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393, 395 (2d Cir. 2010). The court concluded its decision by praising Judge

27

Kaplan for his resolution of the privilege waiver issues. The Second Circuit stated: "[W]e wish to note the exemplary manner in which the able District Judge has discharged his duties. There is no question but that all concerned, not least this Court, are well served by the careful and comprehensive analysis which is evident repeatedly throughout the many memoranda and orders of the District Court, many of which were produced with rapidity in the context of the District Court's daunting schedule in this and other important cases." *Id.* at 396. The Pages, remarkably and wrongly, assert that the Second Circuit offered only a "tepid" endorsement of Judge Kaplan's ruling. Page Br. 28. But they offer no reason why this Court should disagree with the Second Circuit's conclusion that Judge Kaplan got the privilege waiver issue exactly right.

Here, the magistrate judge correctly determined that Donziger's waiver encompasses documents possessed by the Pages. There is no dispute that the Pages were functioning as Donziger's interns (and later his junior associates) and worked on the Lago Agrio litigation at his direction and under his direct supervision. *See* JA 1584 ("it is clear to me that all of the work that was performed here was performed under Mr. Donziger"); JA 474 (Page declaration that he worked with Donziger "as a law student under his supervision, and as a practicing attorney retained by him and his clients, for over six years"). Because there existed a single privilege between Donziger's law firm and its clients — rather

28

than multiple privileges running between each individual lawyer at Donziger's firm and its clients — the Donziger waiver applies to documents held by the Pages. As the magistrate judge explained, "[i]t's not as if the privilege is somehow protected because [Donziger] may have 5 other people in 5 other states working under his direction." JA 1585. To the contrary, it makes "no difference here, because they're working on the same case, they're working under his direction with respect to the same crime." *Id.*; *see also, e.g.*, *Fonar Corp. v. Johnson & Johnson*, 227 U.S.P.Q. 886, 887 (D. Mass. 1985) ("One waiver thus waives the privilege as to all the lawyers working jointly on the matter.").

Judge Kaplan recently rejected the exact argument the Pages advance here. In *Donziger*, he held that Donziger's waiver extended to a lawyer who, like the Pages, worked for Donziger on the Lago Agrio litigation. *Donziger*, 2013 U.S. Dist. LEXIS 55877. In fact, Judge Kaplan described the claim that the waiver did not extend to this lawyer as "especially baseless," pointing out that, like the Pages, she was an attorney who at all relevant times worked under Donziger's supervision. *See id.* at *25 (citing with approval Judge Day's ruling concerning the Pages); *see also Chevron Corp. v. Salazar*, 275 F.R.D. 437, 447-50 (S.D.N.Y. 2011) (waiver applies to Donziger's co-counsel).

The Pages contend that Donziger's waiver was "compelled" and not "voluntary." Page Br. 25. But this is not so. As Judge Kaplan explained,

Donziger made "a voluntary and deliberate choice" not to produce a privilege log "for an improper reason":  to delay and obstruct discovery, and gain an unfair tactical advantage:

> As there was abundant (if not unanimous) case law holding that the failure to supply a privilege log *when required* would or could waive any claims of privilege, Donziger's intentional failure to do so, especially for the purpose of gaining a tactical advantage, constituted a *voluntary* waiver.  He and his clients must be deemed responsible for the natural and predictable consequences of his intentional failure to act.

2013 U.S. Dist. LEXIS 55877, at *15 (footnote omitted).  The Pages consign Judge Kaplan's decision to a footnote, in which they do not identify any actual errors in his ruling, but simply assert that this Court "should not give weight" to the ruling because it purportedly does not contain "a thorough analysis of privilege," even though Judge Kaplan devoted several pages to analyzing and rejecting the same privilege arguments the Pages present here.  *See* Page Br. 29 n.61.

The cases the Pages rely upon are not to the contrary.  In both *International Union of Operating Engineers v. Philip Morris*, No. 3:97-0708, 1999 US Dist. LEXIS 21097 (S.D. W.Va. June 28, 1999), and *Leonen v. Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990), the parties avoided waiver by acting diligently and taking the legally necessary steps to maintain the confidentiality of their documents. Here, in contrast, Donziger *defied* his legal obligations in an attempt to seize an

improper tactical advantage.  The Pages also liken this case, erroneously, to

*Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646 (9th Cir. 1978).  In

*Transamerica*, the court held that IBM did not waive privilege when it

inadvertently produced some privileged documents during an expedited discovery

process.  *See id.* at 651 (agreeing that "under the rather extraordinary

circumstances of the accelerated discovery proceedings . . . IBM's inadvertent

production there of a limited number of privileged documents was, in effect,

'compelled,' and therefore no waiver of the privilege could be predicated upon

such involuntary production").  Here, in contrast, the waiver was *not* inadvertent,

but rather was the predictable and direct consequence of Donziger and the

Ecuadorian Plaintiffs' bad-faith effort to obtain a tactical advantage by failing to

file a privilege log as required under the local rules.

The Pages suggest that the magistrate judge somehow interfered with the

Southern District of New York proceeding by determining that Donziger was

obligated to collect documents from the Pages' files.  Page Br. 29.  But the court

did not order Donziger to do anything; rather, the court simply made the common-

sense observation that a senior lawyer ordered to produce documents concerning a

case cannot credibly claim that he does not have the documents in question

because they are in the possession of one of his junior associates.  *See* JA 1585

(reasoning that because the Pages worked under Donziger's direction, "[t]here is

31

no reason for the documents that were in their possession not to have been produced with the other Donziger materials"); *accord* 2013 U.S. Dist. LEXIS 55877, at *13 (statement of Judge Kaplan that Donziger should have produced documents from his associate's files, and noting that "if Donziger simply complied with the order to which he has long been subject, the controversy regarding these subpoenas would be moot"). Accepting the Pages' argument would endorse their shell-game tactics by permitting a senior lawyer to evade a court order compelling the production of documents by falsely claiming that documents in the possession of his junior associates and interns were outside of his control.

Finally, the Pages argue that the Donziger waiver should extend no later than October 20, 2010, the date on which Judge Kaplan first found waiver. Page Br. 30-31. That assertion is baseless. The waiver imposed by Judge Kaplan did not have an end date of October 20, 2010, a fact that was confirmed by the parties' conduct after that date. In particular, Donziger produced thousands of documents dated <u>after</u> October 20, 2010, including producing entire "images of computer hard drives in Donziger's possession, custody or control" in late January 2011 — more than three months after the waiver order. JA 1942. Included in the hard drives Donziger produced was the hard drive of his associate Andrew Woods. Those hard drives contained documents dated as late as January 28, 2011. Judge Kaplan, in issuing an order in January 2011 requiring Donziger to turn over his hard drive,

32

*id.*, and in issuing an order in August 2011 requiring Donziger to produce all documents within his "control" based on the waiver, did not limit the waiver to documents created before October 20, 2010.  JA 1394 – 1396.

Even accepting the Pages' claim that documents from the post-October 20 time period were not subject to the waiver and remained privileged, that privilege has been waived by Donziger's having produced documents from that time period without making any claim of privilege.  *See Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F. 3d 120, 125 (4th Cir. 1994); *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981).

### B.    The Crime-Fraud Exception Provides An Additional And Independent Basis For Waiver.

The judgment below can be affirmed on the alternative ground that disclosure is warranted under the crime-fraud exception to the attorney-client privilege.  The crime-fraud exception is triggered upon a prima facie showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud.  *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999).  A district court's crime-fraud determination will not be reversed "absent a *clear* showing of abuse of discretion," *In re Grand Jury*

33

*Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) (emphasis added), and the Pages

come nowhere close to demonstrating a clear abuse of discretion here.

### 1.    The Evidence Of Fraud Is Overwhelming.

Chevron established far more than the necessary prima facie case of fraud.

Among other things, it demonstrated that the Ecuadorian Plaintiffs' lawyers and

consultants ghostwrote the judgment of the Ecuadorian court. As the magistrate

judge determined following an extensive in-court evidentiary presentation by

Chevron's lawyers, the evidence showed that the Fusion Memo drafted by Mr.

Page appeared verbatim in the court's opinion:

> I do think that probable cause has been established if for no other
> reason than for the production of the admittedly co-authored, or
> documents co-authored by the Pages, which has found its way into the
> decision by the Ecuadorian court, buttressed at least by the submission
> by plaintiff, I'm sorry, the movant here or the analytical report of their
> expert, shown to me in a presentation to me that was very effective
> and certainly supported by the submissions to the court, that it is a
> virtual line-by-line entry on many occasions.

JA 1591.

And that was just the tip of the iceberg. Chevron also introduced evidence

that:

- The Ecuadorian Plaintiffs, through their attorneys and consultants, forged the reports of their own expert, Charles Calmbacher, after Calmbacher's conclusions did not match their expected results. Instead of filing the reports that Calmbacher provided them, they affixed his signature to reports they had drafted instead. *See* JA 1935 – 1937; *see also Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 636 ("The [Ecuadorian Plaintiffs], through their counsel, submitted forged reports in the name of Dr. Calmbacher.").

- The Ecuadorian Plaintiffs, through their attorneys and consultants, secretly arranged for the Ecuadorian court to appoint Richard Cabrera as the purportedly "independent" court expert and then hired U.S.-based consultants to ghostwrite his report. They later concealed their fraudulent scheme by having Stratus Consulting, the true authors of the Cabrera report, prepare false "objections" to it, which Stratus then responded to in a supplemental report, again under the name of Cabrera. The Stratus employees have now disavowed the report and its findings under oath, explaining that they had been misled by Donziger. *See* JA 855 – 879; *Chevron Corp. v. Donziger*, 886 F. Supp. 2d at 289 ("There is no genuine issue with respect to the facts that the [Ecuadorian Plaintiffs'] team secretly prepared [Cabrera's] work plan, worked closely

35

with him in carrying it out, and drafted most of the report and its annexes.
. . . This uncontradicted evidence demonstrates that the report and
subsequent responses filed in Cabrera's name were tainted by fraud.")
(citations and footnote omitted).

- When the Cabrera fraud was in the process of being revealed, the
  Ecuadorian Plaintiffs and Donziger, aided by other counsel, including the
  Patton Boggs law firm, decided to "cleanse" the Cabrera report.  To that
  end, they hired new experts to "address Cabrera's findings in such a
  subtle way that someone reading the new expert report (the Court in Lago
  or an enforcement court elsewhere) might feel comfortable concluding
  that certain parts of Cabrera are a valid basis for damages."  *See* JA 1326
  (Ecuadorian Plaintiffs' counsel outlining plan to "'cleanse' any perceived
  impropriety related to the Cabrera Report"); JA 1333 (Ecuadorian
  Plaintiffs' counsel stating that "we did not want to take a position that
  could compromise our ability to cleanse the record in ecuador [sic]");
  JA 1348 (Ecuadorian Plaintiffs' counsel recommending that they "rely
  solely on the curative additional reports as our 'cleanser' as opposed to
  the notion of full disclosure"); *see also* JA 879 – 882; *Donziger*, 886 F.
  Supp. 2d at 260-62 (describing the cleansing process) (footnote omitted);
  *Donziger*, 768 F. Supp. 2d at 610-11, 636-37 (same).

36

- The Ecuadorian Plaintiffs, through their attorneys and consultants, engaged in a systematic pressure campaign based on misinformation, which included collusion with the Ecuadorian government to pressure the Ecuadorian court to rule against Chevron and to indict TexPet's attorneys to exert additional pressure on Chevron. *See* JA 838; JA 882 – 907; JA 1835; JA 2058 – 59; *Donziger*, 768 F. Supp. 2d at 614-16.

In short, as the court below recognized, "there is a lot of other information that [Chevron] has provided to support the notion that there is fraudulent activity." JA 1592.

The Pages' attacks on the court's ruling are baseless. They open their argument with a gross mischaracterization: that "[i]n finding that Chevron established a *prima facie* case of crime-fraud, the lower court relied almost exclusively upon" Judge Francis's prior ruling. Page Br. 17. This is plainly untrue. The court did not even mention Judge Francis's opinion in the course of its crime-fraud discussion. *See* JA 1591 – 1592. Instead, it independently analyzed the evidence. At the end of its independent analysis, it noted that it agreed with the many other courts throughout the federal system that have found crime-fraud. JA 1592 ("And I do accept the findings, the factual findings, of my colleagues in the federal courts of the United States on this issue where it has been made."). The Pages point to no language in the court's opinion suggesting that, in reaching its

crime-fraud conclusion, it relied in any way — let alone "almost exclusively" — on Judge Francis's opinion.

The reason the Pages would make such a bizarre assertion — bizarre because it is so obviously false — becomes clear on the next page of their brief, where they cite *Chevron Corp. v. Weinberg Group*, 682 F.3d 96 (D.C. Cir. 2012). In that case, the D.C. Circuit vacated a district court order that it determined had relied exclusively on orders from Judges Francis and Kaplan that it thought had been called into question by the Second Circuit's *Salazar* ruling. The D.C. Circuit stated that the district court "did not independently explain what facts would support [its] conclusion," but instead "relied almost entirely" on a decision of another court. *Weinberg* has little to say about *this* case for the obvious reason that here, the court did *not* rely exclusively on Judge Francis' order — indeed, it did not even *mention* his order in its crime-fraud discussion — but instead reached its own independent conclusion based on facts it specifically identified in its ruling.[6]

---

[6]  In addition, Judge Kaplan has now answered the question posed by the D.C. Circuit — whether the factual findings at issue remain valid in the wake of *Salazar*. He answered that question in the affirmative, reaffirming repeatedly all of the prior fraud findings. *See Chevron Corp. v. Donziger*, No. 11-cv-0691, 2013 WL 646399 (S.D.N.Y. Feb. 21, 2013); *Donziger*, 886 F. Supp. 2d 235; *Chevron Corp. v. Donziger*, No. 11-cv-0691, 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013).

The magistrate judge discussed how "documents co-authored by the Pages . . . found [their] way into the decision in Ecuadorian court" and that "it is a virtual line-by-line entry on many occasions." JA 1591. This is smoking-gun evidence of fraud. The court also noted the Pages' failure to provide any meaningful explanation of how their words made it into the court's opinion. *See* JA 1592 (pointedly noting that the Pages' silence on this point did not "pass the smell test"). The Pages argue that one could draw other permissible inferences from the fact that significant portions of the drafts they wrote reappeared verbatim as the opinion of the Ecuadorian court. Page Br. 21 (speculating that "the Ecuadorian trial court could [ ] have borrowed the relevant language via a number of non-nefarious means" or might have "taken the language from a press packet"). But even assuming the Pages' preferred inferences are permissible inferences that might be drawn from the evidence, that does not mean they are the *only* permissible inferences. That the magistrate judge drew different permissible inferences does not establish reversible error in light of the deference accorded to the lower court's findings of fact.

The court's conclusion is buttressed by the findings of other courts that have considered the same evidence that was before the court in this case. For example, Judge Kaplan has held that "there is probable cause to suspect, and often stronger evidence, that . . . [r]epresentatives of the [Ecuadorian Plaintiffs] bribed the

39

Ecuadorian judge to obtain the result they wanted and, as part of the deal, wrote the Judgment to which the judge put his name.  Indeed, there is substantial evidence corroborating that assertion, not least of it the fact that significant parts of the Judgment match — word-for-word — internal work product documents of the [Ecuadorian Plaintiffs] that never were publicly filed in the Lago Agrio case." *Donziger*, 2013 WL 1087236, at *2 (footnote omitted).  Similarly, a federal court in Florida determined that "Chevron has obtained mounds of evidence . . . that suggests that the judgment itself was also ghostwritten.  For example, a forensic document analysis conducted on the judgment revealed that it contains verbatim passages that were taken from various pieces of the [Ecuadorian Plaintiffs] lawyers' internal, unfiled, work product."  *In re Chevron Corp*., No. 11-24599-cv, 2012 WL 3636925, at *2 (S.D. Fla. June 12, 2012).

### 2. The Pages' Demand For An In Camera, Document-By-Document Review Is Misplaced.

The Pages argue that the magistrate judge should have analyzed each document to determine whether it bore the requisite relationship to the fraud.  But this Court has recognized that a document-by-document analysis is not necessary where, as here, the lawyer was retained to perpetrate a fraudulent scheme.  *See In re Grand Jury Investigation*, 352 F. App'x 805, 809-10 (4th Cir. 2009) (per curiam) ("[T]he Corporation sought Counsel's legal advice for the sole purpose of

facilitating its scheme to defraud the United States. Therefore, *all* of the withheld documents bear the requisite close relationship to the alleged violation . . . because they were in furtherance of the fraudulent scheme.") (emphasis added). Here, the magistrate judge expressly determined that "*all* of the work that was performed here [by the Pages] was performed under Mr. Donziger," (JA 1584 (emphasis added)), and the Pages have never claimed that they performed any work for Donziger other than their work on the fraudulent Ecuadorian litigation and judgment. In short, it is "abundantly evident that a fraudulent scheme existed;" that the Pages, "in the day-to-day fulfillment of [their] duties," were employed "to perpetuate that scheme;" and that through their "complete involvement," they "furthered the fraudulent operation as a whole." *United States v. Cohn*, 303 F. Supp. 2d 672, 678, 682-83 (D. Md. 2003).

The Pages participated in the Ecuadorian Plaintiffs' plan to pressure the Ecuadorian court to discontinue the required judicial inspections and appoint Cabrera (JA 391 – 399) and drafted documents that appear verbatim in the Ecuadorian court's opinion, although they appear nowhere in the Lago Agrio record (JA 407 – 435). They assisted in the Ecuadorian Plaintiffs' collusion with the Republic of Ecuador's attorneys to assert a fraud claim against Chevron in related litigation, and in pushing the Republic of Ecuador to indict Chevron's attorneys based on that same fraud claim, later dropped for lack of evidence. *See*

JA 402 – 406.  The Pages also worked behind-the-scenes to instigate a trumped-up

Foreign Corrupt Practices Act investigation of Chevron — an effort that Mr. Page

himself understood to be a "stretch."  JA 1885.  Even though he knew the charges

would be baseless, Mr. Page stated:  "But journalists and even [Chevron] people

aren't likely to be as sophisticated and see through the construction as easily."  *Id.*

Donziger also directed the Pages to draft a memorandum to "the winston boys,"

pushing them to "paint chevron as a lying manipulative, dishonest company" in

pleadings drafted by Winston & Strawn.  JA 402.  Other evidence of the Pages'

integral and knowing role in the fraud is set forth in the materials filed under seal.

*See, e.g.*, JA 2122 – 2127; JA 2137 – 2145.

The Pages also argue that the magistrate judge should have conducted an in

camera review of all the disputed documents.  But courts in this Circuit and

elsewhere have held that in camera review is unnecessary where, as here, extrinsic

evidence establishes a prima facie case of fraud.  *See, e.g.*, *In re Grand Jury*

*Proceedings*, 33 F.3d at 350-51 (holding that the district court did not err in

declining to conduct an in camera review where the crime-fraud exception had

been satisfied by other evidence); *Shahinian v. Tankian*, 242 F.R.D. 255, 258

(S.D.N.Y. 2007) (in camera review would be "unhelpful in resolving the

applicability of the crime/fraud exception" where it had already been established

by other evidence); *United States v. Kaplan*, No. 02 CR. 883, 2003 WL 22880914,

at *10 (S.D.N.Y. Dec. 5, 2003) (holding in camera review unnecessary and explaining that "*in camera* review is a discretionary alternative to establishing the crime-fraud exception with independent evidence").

Finally, the Pages are wrong in claiming that their "opinion work product" remains protected notwithstanding the crime-fraud finding. As an initial matter, this challenge is waived because the Pages failed to present it in their Rule 72 objections. *See* JA 1398 – 1428. But even if this Court were for some reason inclined to consider the argument, it is meritless. Even the Pages concede that the crime-fraud exception applies to "opinion work product" when the party seeking the information makes a prima facie showing that the attorney was "aware of" the crime or fraud. *See In re Grand Jury Proceedings #5*, 401 F.3d 247, 252 (4th Cir. 2005). Here, as shown above, the record is replete with examples of the Pages' knowing and enthusiastic participation in fraudulent tactics to pressure and deceive Chevron and the Ecuadorian court.

### C. The Magistrate Judge Correctly Found Waiver As To All Documents Disclosed To Third Parties.

As an additional basis for waiver, the magistrate judge held that the attorney-client privilege was waived as to documents that were disclosed to third parties. That conclusion is plainly correct. *See Sweeney*, 29 F.3d at 125 ("Any disclosure inconsistent with maintaining the confidential nature of the attorney-client

43

relationship waives the attorney-client privilege.") (internal quotation marks omitted).

In challenging the lower court's ruling, the Pages attack a straw man. They contend that the magistrate judge held that disclosing *some* documents to third parties waived the privilege as to *all* of the Pages' documents. But that is not what the court held. *See* JA 1587 – 1589. The privilege is waived as to the documents that were disclosed to third parties, as the very case the Pages rely upon makes clear. *See In re Chevron Corp.*, No. H-10-134, 2010 WL 2038826 (S.D. Tex. May 20, 2010) ("[T]he fact that the materials were voluntarily given to Cabrera, an agent of the court, destroys [these] privileges even if [they] were to apply."), *aff'd sub nom. Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373 (5th Cir. 2010). And Mr. Page's privilege log reflects that numerous documents were shared with third parties, such as the persons who wrote the report for Cabrera — and whose work was shared with Cabrera (*see, e.g.*, Ann Maest from Stratus Consulting listed in PLAMP00000196 at JA 1211) and individuals working for Amazon Watch (*see, e.g.*, Kevin Koenig listed in PLAMP00002501 at JA 1254).

The Pages err in contending that even if disclosure to third parties waived the attorney-client privilege, it did not waive work-product protection. *See* Page Br. 33 n.72. As the magistrate judge recognized, materials disclosed to Cabrera (or to the Ecuadorian Plaintiffs' consultants, who ghostwrote the Cabrera report) do

44

not enjoy work-product protection because the Ecuadorian court had ordered

Cabrera to disclose to the parties all materials he relied upon in preparing his

report.  *See* JA 1588; *see also, e.g.*, *In re Chevron Corp.*, Misc. No. H-10-134, Dkt.

107 at 7 (S.D. Tex. Jan. 10, 2011); *Chevron Corp. v. Stratus Consulting, Inc.*, No.

10-cv-00047, 2010 WL 3923092, at *10 (D. Colo. Oct. 1, 2010).

## CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,

s/ Thomas H. Dupree, Jr.
Peter E. Seley
Thomas H. Dupree, Jr.
Claudia M. Barrett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

Dated:  June 17, 2013

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.　　This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 10,585 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.　　This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  June 17, 2013

                                        s/ Thomas H. Dupree, Jr.
                                        Thomas H. Dupree, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2013, the foregoing Brief of Appellee was served on all parties or their counsel of record through the CM/ECF system.

I also certify that eight paper copies of the foregoing Brief of Appellee will be dispatched on the next business day following the CM/ECF filing to a third-party commercial carrier for delivery to the Clerk's Office, as provided in Local Rule 25(a)(1)(B).


Dated:  June 17, 2013                 s/ Thomas H. Dupree, Jr.
                                      Thomas H. Dupree, Jr.